**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| BRIAN C. LATHAM,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 1:25-CV-02374<br><br>JUDGE JOHN R. ADAMS<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Brian C. Latham seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

## I. Procedural History

Mr. Latham filed his DIB and SSI applications on December 11, 2022. (Tr. 21, 85-86.) He alleged disability beginning on December 9, 2022. (Tr. 21, 85-86, 233, 242.) He alleged disability due to back problems, post-traumatic stress disorder (PTSD), anxiety, and depression. (Tr. 130, 149, 279.) His applications were denied at the initial level (Tr. 125-30) and upon reconsideration (Tr. 146-53). He then requested a hearing. (Tr. 154-55.)

A hearing was held before an Administrative Law Judge ("ALJ") on October 15, 2024. (Tr. 42-72.) The ALJ issued an unfavorable decision on December 9, 2024, finding Mr. Latham had not been under a disability within the meaning of the Social Security Act from December 9, 2022, through the date of the decision. (Tr. 18-41.) Mr. Latham's request for review by the Appeals Council was denied on September 8, 2025, making the ALJ's December 9, 2024 decision the final decision of the Commissioner. (Tr. 1-6.)

Plaintiff filed the instant Complaint on November 4, 2025 (ECF Doc. 1), and the matter is fully briefed (ECF Docs. 7, 8, 9). Plaintiff raises the following assignment of error:

> The ALJ failed to adequately account for the social interaction limitations opined by the state agency mental health reviewing experts.

(ECF Doc. 7, pp. 2, 8-12; ECF Doc. 9.)

## II. Evidence

### A. Personal, Educational, and Vocational Evidence

Mr. Latham was thirty-six years old on the alleged disability onset date, making him a younger individual under Social Security regulations on the alleged onset date. (Tr. 34.) Mr. Latham has at least a high school education (Tr. 34, 48, 280) and past work experience as a parts clerk (Tr. 33-34). He worked until December 9, 2022. (Tr. 48.)

### B. Medical Evidence[1]

#### 1. Relevant Treatment History

On May 25, 2022, Mr. Latham saw physician assistant Nicole Wurstle at Ashland Hope419 for a diagnostic assessment and evaluation for depression. (Tr. 487.) He reported losing his job a couple of years earlier due to anger issues. (*Id.*) He was casually dressed,

[1] The medical evidence summarized herein is not exhaustive and is generally limited to evidence cited by the parties or the ALJ that is relevant to the legal and factual issues before the Court.

cooperative, and calm on mental status examination. (Tr. 492.) His eye contact was "fair" and his mood was "good." (*Id.*) He affect was reactive. (*Id.*) He denied hallucinations and suicidal ideation, plan, and intent. (*Id.*) His thought process was linear and goal directed with no abnormal thought associations noted. (*Id.*) His speech was clear and his language, attention span, and concentration were intact. (*Id.*) His insight and judgment were fair. (*Id.*) He was diagnosed with severe recurrent major depression without psychotic features, dysthymia, panic disorder, generalized anxiety, and PTSD. (Tr. 492.) PA Wurstle prescribed Venlafaxine and Effexor XR and recommended therapy for PTSD. (Tr. 492-93.)

Mr. Latham returned to PA Wurstle on June 30, 2022, reporting some improvement in his moods but said he felt it was "easier for him to put a smile on his face at home." (Tr. 479.) Mental status examination findings were similar to those from his May visit. (*Compare* Tr. 481 *with* Tr. 492.) PA Wurstle increased Mr. Latham's prescription for Effexor XR to help with his depression and PTSD and added Seroquel to help with insomnia, depression, and anxiety. (Tr. 481.) He was referred to therapy. (*Id.*)

On July 7, 2022, Mr. Latham attended an initial therapy session with Kimberly Howard at Wooster Hope419. (Tr. 475.) He planned to start outpatient therapy to "learn to express and manage symptoms of agitation, low self-worth, and anxiety." (Tr. 477.)

On August 25, 2022, Mr. Latham followed up with PA Wurstle for medication management. (Tr. 459.) He reported his moods were "a lot better" and it had been easier for him to deal with his anger but his "mind still race[d] 'like crazy'" and his sleep was poor. (*Id.*) Mental status examination findings were similar to those from his May and June appointments with PA Wurstle. (*Compare* Tr. 461 *with* Tr. 481, 492.) PA Wurstle continued prescriptions for

Effexor XR, Venlafaxine, and Seroquel, and added prazosin for nightmares. (Tr. 461-62.) Spravato (esketamine) treatments were added for depression. (Tr. 454, 461.)

On September 26, 2022, Mr. Latham returned to PA Wurstle, reporting no difference in his nightmares with prazosin but said he was getting better quality sleep. (Tr. 454.) He received a Spravato treatment. (*Id.*) Mental status examination findings were generally unchanged from prior visits, but his mood was described as "struggling" rather than "good." (*Compare* Tr. 455 *with* Tr. 461, 481, 492.) PA Wurstle recommended weekly or biweekly Spravato treatments as long as they continued to reduce his symptoms of depression. (Tr. 456.)

Additional Spravato treatments were administered on September 28, 2022, and October 3, 5, 10, 27, 2022. (Tr. 432, 435, 438, 445, 448, 451.) Mr. Latham reported improvement with the treatments. (Tr. 430, 441.) During a virtual therapy session with Ms. Howard on October 17, 2022, he reported "feeling very good after his Spravato treatments" but said that "weekends [we]re harder." (Tr. 430.) He was more irritable on the weekends but was able to control it better. (*Id.*) In late October and early November 2022, he reported that his mood had declined and his suicidal thoughts had increased because he was only able to have one treatment that week due to insurance coverage issues. (Tr. 421, 424.) At a November 23, 2022 appointment, Mr. Latham told PA Wurstle that he continued to get relief from his symptoms with the Spravato treatments, but that the benefits wore off as the week progressed. (Tr. 406.) He wanted to continue with the treatments because he felt worse before starting them, but he was also interested in trying lithium. (*Id.*) He was casually dressed, cooperative, and calm on mental status examination. (Tr. 407.) His eye contact was "fair" and his mood was "good." (*Id.*) His affect was full and reactive. (*Id.*) He denied hallucinations and suicidal ideation, plan, and intent. (*Id.*) His thought process was linear and goal directed with no abnormal thought

associations noted. (*Id.*) His speech was clear and his language, attention span, and concentration were intact. (*Id.*) His insight and judgment were fair. (*Id.*) PA Wurstle started Mr. Latham on low dose lithium to help with his depression. (Tr. 408.)

On December 7, 2022, Mr. Latham returned to PA Wurstle for a Spravato treatment. (Tr. 398.) He reported that the weekly Spravato treatments were beneficial, but that he had done better when he was able to have them twice a week. (*Id.*) He also reported that lithium might be starting to help. (*Id.*)

As of January 3, 2023, Mr. Latham had stopped Spravato treatments. (Tr 384.) He said he did not notice a real difference since stopping the treatment. (*Id.*) Mental status examination findings were generally unchanged from prior examination findings, but his mood was described as "down" with a full and mood-congruent affect. (Tr. 386.) PA Wurstle increased Mr. Latham's Seroquel to help with anxiety and depression. (Tr. 387.)

On March 14, 2023, Mr. Latham returned to PA Wurstle, reporting that he was struggling with not being able to provide for his family. (Tr. 379.) He reported having good days and bad days. (*Id.*) He said he struggled with anger and was easily frustrated, especially when things went wrong. (Tr. 380.) PA Wurstle planned to resubmit the prescription for Spravato and increased prazosin to help with nightmares. (Tr. 382.)

Mr. Latham started Spravato treatments again on March 21, 2023, after receiving insurance approval. (Tr. 376.) He received treatment every few days. (Tr. 370, 373.) But when he saw PA Wurtsle on April 3, 2023, he reported that he continued to struggle with worsening depression and suicidal thoughts and had been for the past three months. (Tr. 583.) He reported suicidal thoughts of overdosing on medication and minimal benefit from his medications. (*Id.*)

On mental status examination, Mr. Latham was cooperative and denied suicidal ideation, plan, or intent, but his mood was described as "low." (Tr. 585.)

When Mr. Latham met with PA Wurstle on May 16, 2023, he told her he felt the once-a-week Spravato treatments were not helping, and he often felt worse the day after a treatment. (Tr. 550.) He was cooperative and his mood was described as "good" on mental status examination. (Tr. 552.) PA Wurstle increased Mr. Latham's lithium to help with his depression, suicidal thoughts, and mood stability. (*Id.*)

On June 6, 2023, Mr. Latham was admitted to the hospital after appearing at the hospital with thoughts of suicide. (Tr. 802.) He said he planned to overdose on his pills and reported three past suicide attempts. (*Id.*) While admitted, he participated in group therapy. (Tr. 806.) At discharge on June 10, 2023, he denied suicidal ideation and was in stable condition. (Tr. 802, 809.) His mental examination at discharge showed: a mild level of distress; an anxious mood; anxious and congruent affect; circumstantial and goal-directed thoughts; cooperative attitude; normal concentration, intelligence, eye contact, appearance, and speech. (Tr. 807.)

Mr. Latham attended therapy with Traci Willis LISW in September 2023 and October 2023. (Tr. 649, 650, 652.) At that time, he was seeing Laura Blanton, APRN, CNP, for medication management. (Tr. 644, 652.) At a medication management appointment with CNP Blanton on October 2, 2023, he reported that his "mood tanked a couple weeks ago and he ha[d]n't been able to get out." (Tr. 652.) Mr. Latham was cooperative, calm, and casually dressed. (Tr. 653.) His grooming was fair and his eye contact was good. (*Id.*) His mood was described as "not great." (*Id.*) His affect was full and reactive. (*Id.*) He denied suicidal ideation, plan, and intent. (*Id.*) His thought process was linear, logical, and goal directed with no delusions, obsessions, compulsions, phobias, or abnormal thought associations evident. (*Id.*)

His speech was clear and his attention span, concentration, and language were intact. (*Id.*) His insight and judgment were fair. (*Id.*)

When Mr. Latham saw CNP Blanton on December 26, 2023, he reported doing okay with some ups and downs and some good days and bad days, but with more bad days than good. (Tr. 667-68.) His mental status examination findings were similar to those from his October visit except that his mood was described as "depressed." (*Compare* Tr. 668 *with* Tr. 653.)

As of February 28, 2024, Mr. Latham had resumed Spravato treatments and was also undergoing TMS (transcranial magnetic stimulation). (Tr. 636, 641.) He continued to receive Spravato treatments and undergo TMS throughout March and reported that things were going well. (Tr. 613, 618, 619, 622, 626, 632.) During a March 14, 2024 therapy session with LISW Willis, Mr. Latham reported a positive increase in his mood with a decrease in suicidal thoughts since starting Spravato treatments and TMS. (Tr. 616.) On April 1, 2024, he reported that he started to have suicidal thoughts again, but they were only happening every once in a while, and he denied any suicidal plan. (Tr. 784.) He still felt that Spravato was helping and did not think that his "mood dropped after stopping TMS." (*Id.*) He continued with Spravato treatments in April with positive results. (Tr 770, 773.) At the end of May 2024, his Spravato treatments were back to only once a week. (Tr. 725.) On May 20, 2024, Mr. Latham told CNP Blanton that he was doing okay, had a good weekend, and had plans to go to a family's house for Memorial Day. (Tr. 732.) When he saw CNP Blanton on May 29, 2024, he reported a "slight dip in his mood," stating that he was worrying about a lot of things and his anxiety was worse than his depression. (*Id.*) His mood was described as "ok" and his affect was semi-reactive. (Tr. 726.) Otherwise, mental status examination findings were unchanged from prior examination findings. (*Id.*)

At a July 10, 2024, appointment with CNP Blanton, Mr. Latham reported that "things [we]re continuing to go well" and he had "no concerns at th[e] time." (Tr. 700.) He planned to continue with weekly treatments. (*Id.*) The following week, on July 17, 2024, Mr. Latham reported that he was "[f]eel[ing] good and stable" and he wanted to stop lithium. (Tr. 700.) On July 25, 2024, he discussed restarting TMS. (Tr. 978.) But on August 8, 2024, he stated he was not able to do TMS due to his wife's schedule. (Tr. 972.) On August 14, 2024, he told CNP Blanton things were going "okay," but he did not feel that he was getting better. (Tr. 969.) He said he was continuing to pursue disability. (*Id.*) His mental status examination findings were similar to prior findings. (*Compare* Tr. 970 *with* Tr. 726.)

He continued with Spravato treatments in September. (Tr. 951, 954.) When he saw CNP Blanton on September 11, 2024, he reported that he was "feeling better overall with . . . mood[,]" and he denied "additional stressors[.]" (Tr. 953.) On September 18, 2024, he reported his "mood ha[d] been good" and he was "continu[ing] to do well." (Tr. 950.)

**2. Relevant Opinion Evidence**

**i. Treating Source**

On October 10, 2024, CNP Blanton completed a Medical Source Statement regarding Mr. Latham's ability to perform work-related mental activities. (Tr. 981-83.) With respect to Mr. Latham's social interaction limitations,[2] CNP Blanton opined that Mr. Latham was mildly limited in his ability to: work in coordination with or in proximity to others without distracting them or exhibiting behavioral extremes; and relate to the general public and maintain socially appropriate behavior. (Tr. 981.) She opined that he was moderately limited in his ability to

[2] CNP Blanton offered other opinions but Mr. Latham's challenge in this appeal relates to the ALJ's assessment of his social interaction limitations. Accordingly, the balance of her opinion is not summarized here.

respond appropriately to coworkers or peers, and markedly limited in his ability to accept instructions from or respond appropriately to criticism from supervisors or superiors. (*Id.*)

CNP Blanton also authored a letter dated October 10, 2024, in which she stated that Mr. Latham had been under the care of providers at Hope419 since May 2022 for treatment and management of major depressive disorder, dysthymic disorder, generalized anxiety, a panic disorder, insomnia, and PTSD. (Tr. 990.) She also stated that Mr. Latham's depression had been "markedly difficult to treat" and that his providers had tried multiple treatments, including counseling, traditional pharmaceutical management, and alternative treatments such as ECT, TMS, and esketamine treatment. (*Id.*) She further stated that Mr. Latham's condition would make it "significantly difficult [for him] to perform in a job setting." (*Id.*)

**ii. State Agency Psychological Consultants**

On May 1, 2023, state agency psychological consultant Kristen Haskins, Psy.D., completed a Psychiatric Review Technique ("PRT") (Tr. 78-79, 92-93) and Mental RFC Assessment (Tr. 82-83, 96-97). Dr. Haskins opined that Mr. Latham had mild limitations in his ability to understand, remember, or apply information, and moderate limitations in his ability to: interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. (Tr. 79, 93.) She opined that the he had the RFC to: perform a range of short cycle tasks without strict production demands in a setting where he could work away from the distractions of others; sustain superficial, occasional contact with others, including coworkers, supervisors, and the general public in a work setting; and adjust to minor changes in the work setting and still complete an ordinary routine consistently on an independent but major changes would need to be introduced in advance and gradually phased into to allow time to adjust to new expectations. (Tr. 82-83, 96-97.)

On October 5, 2023, state agency psychological consultant Sylvia Chen, Ph.D., completed a PRT (Tr. 101-03, 114-16) and Mental RFC Assessment (Tr. 106-08, 119-21). She opined that Mr. Latham had moderate limitations in his ability to: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. (Tr. 102, 115.) She also opined that Mr. Latham could: "understand, carry out and remember simple instructions, make simple work-related decisions, . . . [and] sustain concentration, attention, and pace sufficient enough for the completion of simple tasks for two-hour intervals over the course of a typical eight-hour workday"; and would "function best in an environment that requires only occasional and superficial interactions with co-workers, supervisors, and the public in a familiar, low stress setting that has no significant changes in task expectations or require high production rate or pace" due to "residual symptoms and difficulty regulating emotions on a sustained basis." (Tr. 108, 121.)

**C. Hearing Testimony**

Mr. Latham testified in response to questions from the ALJ and his attorney at the October 15, 2024 hearing. (Tr. 47-63.) A Vocational Expert ("VE") also testified. (Tr. 63-72.) The VE testified that a hypothetical individual of Plaintiff's age, education, and work experience, with the functional limitations described in the RFC determination (Tr. 26-27, 66-67), could not perform Mr. Latham's past work but could perform representative positions in the national economy, including housekeeping cleaner, mail clerk, and small products assembler (Tr. 67).

## III. Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920[3]; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

---

[3] The DIB and SSI regulations cited herein are generally identical. For convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

*See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy. *Id.*

## IV. Law & Analysis

### A. Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986))

(alteration in original). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

### A. Sole Assignment of Error: The ALJ Adequately Explained Her Evaluation of the State Agency Psychological Consultants' Opinions Regarding Social Interaction

In his sole assignment of error, Mr. Latham argues that the ALJ erred in her analysis of the state agency psychological consultants' opinions as to his functional limitations in interacting with others, first because the ALJ rejected the consultants' stated limitation to "superficial" interactions, second because she then adopted a mental RFC with a "superficial-like limitation" to "no tandem tasks," and third because she did not explain why the "no tandem tasks" limitation was applied to coworkers but not supervisors. (ECF Doc. 7, pp. 8-11; ECF Doc. 9.)

The Commissioner responds that the ALJ explained her rationale for not including all of the state agency consultants' social interaction limitations, "specifically rejecting the need for a

limitation to 'superficial' interaction." (ECF Doc. 8, pp. 5-6.) The Commissioner also argues: "[E]ven if the ALJ had found the social limitations in Drs. Haskins and Chen's prior administrative medical findings fully persuasive, which she did not, the ALJ adequately accounted for a limitation to 'superficial' interaction in the RFC." (*Id.* at p. 6.)

On initial review, state agency psychological consultant Dr. Haskins opined that Mr. Latham had moderate limitations in his ability to interact with others (Tr. 79, 93) and could "sustain superficial, occasional contact with others in a work setting, including coworkers, supervisors and the general public" (Tr. 82, 96). On reconsideration, Dr. Chen opined that Mr. Latham had moderate limitations in interacting with others (Tr. 102, 115) and would "function best in an environment that requires only occasional and superficial interactions with co-workers, supervisors, and the public" due to his "residual symptoms and difficulty regulating emotions on a sustained basis" (Tr. 108, 121). The ALJ found both opinions "partially persuasive," offering the following explanation regarding the consultants' opined social interaction limitations:

> [G]iving full consideration to the claimant's reported anxiety and panic attacks, social limitation demands are dictated. However, the claimant's ability to interact cooperatively with medical providers, and his ability to socialize and work with family without altercation negates the need for a limit to superficial interactions. Also, the claimant's consistently intact attention during medical appointments negates the need for working away from the distraction of others. Occasional social interaction is dictated though, giving full consideration to the claimant's subjective symptoms, as such term is vocationally defined. The undersigned has further limited the claimant to not engaging in tandem tasks with coworkers at all, which is a maximum limitation under the SSA requirements that the RFC is a maximum of what the claimant can do. The undersigned also reduced the claimant's tolerance for public contact for the same reason. By eliminating all public interaction and by further limiting work with coworkers to nothing involving tandem work, the undersigned has greatly reduced any alleged triggers for escalation of symptomatology. Further reduction is not warranted based on this record, with support below:
>
> March 6, 2024 "mood is good; denies side effects" 10F/17.
> March 13, 2024 "things going well; doctors noticed remarkable improvement" 10F/9

March 20, 2024 "Wants to turn the farm into a tree farm for money" 11F/98
April 1, 2024 "Wants to stop therapy because of mood improvement" 11F/87
April 10, 2024 "Doing very well; training his puppy" 11F/81
May 2024 "Mood is good; anxiety is manageable" 11F
May 21, 2024 "Good weekend to go to family's for Memorial Day" 11F/37
June 7, 2024 "Doing well, levels out" 14F/23
June 12, 2024 "Going good, mood good, no high and lows, busy with kids and puppy"
14F/20
June 19, 2024 "Doing well" 11F/17
June 26, 2024 "Doing well, sleeping well, anxiety not too bad" 10F/14.
July 3, 2024 "Doing well, going to fireworks in Loudonville this weekend" 10F/11
July 17, 2024 "Feeling good and stable, wants to stop Lithium; no side effects from medications" 11F/5
August 14, 2024 "Mood is maintaining; still going for disability" (16F/41
September 11, 2024 "doing well" 16F/25
September 18, 2024 "continued to do well" 16F/22[.]

(Tr. 31-32.) The ALJ then adopted an RFC with a limitation to "no interaction with the public, only occasional interaction with coworkers and supervisors, and no tandem tasks." (Tr. 33.)

Focusing on both consultants' limitation to "superficial" interactions, Mr. Latham argues that the ALJ erred by: (1) "reject[ing] the need for 'superficial' interactions" without explaining how her "reasoning contradicted a limitation to 'superficial' interaction with others" (ECF Doc. 7, pp. 8-9); (2) including "a superficial-like limitation by restricting Mr. Latham to no tandem tasks," which is "a quality-like social interaction limitation," despite "explicitly reject[ing]" a limitation to superficial interactions (*id.* at pp. 9-10); and (3) failing to explain why the limitation to "no tandem work" was applied to coworkers but not supervisors (*id.* at pp. 10-11). The undersigned will address each argument in turn.

First, the undersigned finds no merit in Plaintiff's argument that the ALJ did not adequately explain why she rejected a limitation to "superficial interaction." She specifically explained that "the claimant's ability to interact cooperatively with medical providers, and his ability to socialize and work with family without altercation negates the need for a limit to

superficial interactions." (Tr. 31.) Prior to making this finding, the ALJ provided a detailed discussion of Mr. Latham's mental health treatment records (Tr. 28-30) and explained:

> The claimant has a moderate limit in interacting with others. This area of mental functioning refers to the ability to relate to and work with supervisors, coworkers, and the public. For example, asking for help, handling conflict, understanding and responding to social cues, and keeping social interactions free of excessive irritability, sensitivity, or argumentativeness. The claimant described panic attacks, irritability, and social isolation. However, the claimant described attending family gatherings without altercation. Also, the claimant was able to attend numerous doctor appointments, his consultative examination, and his administrative hearing without issue, and was cooperative and engaged during these various interactions[].

(Tr. 30 (emphasis added) (citations omitted).) Having already highlighted and cited the supporting evidence, the ALJ was not required to "reproduce the list of these treatment records a second time" in her analysis of the state agency opinions. *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) (citing *Forrest v. Comm'r of Soc. Sec.,* 591 F. App'x 359, 366 (6th Cir. 2014)); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006). The undersigned therefore concludes that the ALJ adequately explained her reasons for rejecting the state agency consultants' opined limitation to "superficial interactions." Further, to the extent the RFC adopted by the ALJ "conflict[ed] with" the state agency opinions, the undersigned also finds that the ALJ adequately "explain[ed] why the opinion was not adopted." *See* SSR 96-8p, *Assessing Residual Functional Capacity in Initial Claims*, 61 Fed. Reg. 34474, 34478 (July 2, 1996).

After first arguing that the ALJ erred by *not* adopting a limitation to "superficial interactions," Mr. Latham next argues that the ALJ erred when she effectively "agree[d] with the state agency that a that a superficial type of social interaction limitation was necessary" and adopted a limitation to "no tandem tasks." (ECF Doc. 7, pp. 9-10.) He asserts that the ALJ erred because her analysis was "internally inconsistent," first rejecting a limitation to "superficial interactions" and then adopting a limitation to "no tandem tasks." (*Id.*; ECF Doc. 9.) Having reviewed the ALJ's analysis, the undersigned finds that this argument lacks merit.

After rejecting "the need for a limit to superficial interactions" based on Mr. Latham's observed ability to "interact cooperatively with medical providers" and "socialize and work with family without altercation" (Tr. 31), the ALJ adopted an RFC that limited Mr. Latham "to not engaging in tandem tasks with coworkers at all," explaining that this limitation and an additional limitation "eliminating all public interaction" would "greatly reduce[] any alleged triggers for escalation of symptomatology"[4] (Tr. 32). The ALJ went on to explain that she found further limitations "not warranted based on this record," citing specific mental health treatment records in which Mr. Latham was noted to be doing "well" or to have a mood or anxiety that was "good," "improv[ing]," "manageable," "maintaining," "stable," or "not too bad." (*Id.*)

It is well established that the ALJ was "not required to recite the medical opinion of a physician verbatim in h[er] [RFC] finding," *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009), and specifically was not required to "adopt [the] state agency psychologist[s'] opinions verbatim" or to adopt their "limitations wholesale," *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015). Here, the undersigned finds the ALJ adequately explained her reasons for rejecting a general limitation to "superficial interactions," for adopting a specific limitation to "no tandem tasks," and for concluding that further limitations were "not necessary."

Mr. Latham's observation that "Courts have found that a limitation to 'superficial' interaction means that the claimant has quality-like interaction limitations" (ECF Doc. 7, p. 10) does not change this analysis. As the undersigned has previously explained, "superficial" is not a defined term in the Dictionary of Occupational Titles ("DOT"), the Selected Characteristics of

[4] Notably, state agency consultant Dr. Chen had opined that Mr. Latham would "function best in an environment that requires only occasional and superficial interactions with co-workers, supervisors, and the public" due to his "residual symptoms and difficulty regulating emotions on a sustained basis" (Tr. 108, 121).

Occupations ("SCO"), or the governing regulations.[5] *See Lopez v. Comm'r of Soc. Sec.*, No. 1:22-CV-01801, 2024 WL 1580101, at *19 (N.D. Ohio Apr. 11, 2024) (collecting cases). The newer Standard Occupational Classification system ("SOC") also does not define the term, *see Standard Occupational Classification Manual*, Office of Management and Budget (2018) https://www.bls.gov/soc/2018/soc_2018_manual.pdf, accessed 10/19/2026, and general dictionary definitions do not identify what specific work-related interactions are considered "superficial" in a vocational context, *see Lopez*, 2024 WL 1580101, at *19 (quoting Merriam-Webster's Unabridged Dictionary, Merriam-Webster, https://unabridged.merriam-webster.com/unabridged/superficial)). Given the lack of a standard or universal definition of "superficial interactions" in vocational resources, there is no inherent inconsistency in the ALJ's finding that a general limitation to "superficial interactions" was not supported by the record while a more specific limitation to "no tandem tasks" was supported. Conversely, again recognizing that there is no standard definition of "superficial interactions" in the vocational context, there is also no inherent inconsistency in the finding of other courts "that limiting an individual to no team or tandem tasks is sufficient to account for a physician's opinion that an individual be limited to superficial interactions with 'others[.]'" *See Wieman v. Comm'r of Soc. Sec.*, No. 3:22 CV 1045, 2023 WL 5541597, at *3 (N.D. Ohio Aug. 29, 2023) (citing cases). The question here is whether the ALJ adequately explained her reasoning and made findings that were supported by substantial evidence. The undersigned finds both requirements met here.

Turning finally to Mr. Latham's argument that reversal is required because "the ALJ failed to explain why a limitation [to no tandem tasks] was included with respect to coworkers

[5] In contrast, "[t]he DOT and SCO do have specific defined terms for the frequency of activities or conditions, defining 'occasional' activities and conditions as those existing up to 1/3 of the time." *Stoodt v. Comm'r of Soc. Sec.*, No. 3:20-CV-02370, 2022 WL 721455, at *17 (N.D. Ohio Jan. 13, 2022), *report and recommendation adopted Stoodt v. Comm'r of Soc. Sec.*, No. 3:20-CV-2370, 2022 WL 716105 (N.D. Ohio Mar. 10, 2022).

but no such equivalent limitation was included with respect to supervisors" (ECF Doc. 7, pp. 10-11; ECF Doc. 9), the undersigned observes that Mr. Latham has effectively acknowledged that the ALJ's reasons for excluding supervisors from the "no tandem tasks" limitation were evident "as employees do not engage in work duties along side [sic] their supervisors – they do not work together." (ECF Doc. 7, p. 11.) Rather than arguing that the ALJ should have better explained why he did not preclude tandem tasks with supervisors, Mr. Latham appears to be arguing that the ALJ erred because she "added a superficial-like limitation with respect to co-workers" but did not adopt a similarly "superficial-like" limitation for supervisors. (*Id.*) But again, the ALJ explained why she rejected a limitation to "superficial interactions," why she adopted a limitation to "no tandem tasks" with coworkers, why she precluded interactions with the public, and why she found "[f]urther reduction is not warranted based on this record." (Tr. 31-32.) The ALJ was not required to "adopt [the] state agency psychologist[s'] opinions verbatim," *Reeves*, 618 F. App'x at 275, and she adequately "explain[ed] why the opinion[s] w[ere] not adopted" *see* SSR 96-8p, 61 Fed. Reg. at 34478. Mr. Latham has not shown that the ALJ's explanation was inadequate, nor has he met his burden to demonstrate that the ALJ's findings regarding the state agency psychological consultants' opinions lacked the support of substantial evidence.

For the reasons set forth above, the undersigned finds the ALJ provided an adequate explanation for her findings regarding the persuasiveness of the state agency psychological consultants' opinions. She was not required to adopt their social interaction limitations verbatim and she adequately explained her rationale for not adopting all of the limitations. Further, the undersigned finds Plaintiff has failed to show that the ALJ's findings were internally inconsistent, lacked legal support, or lacked the support of substantial evidence. Accordingly, the undersigned finds Mr. Latham's sole assignment of error lacks merit.

## V. Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED.**

October 19, 2026

*/s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).